**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MICHAEL A. WOOD, | : | Case No. 3:18-cv-168 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CHAD EUBANKS, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Michael A. Wood was arrested by Defendants at the Clark County Fairgrounds and was charged with disorderly conduct and obstructing official business. The State, however, was unable to locate lay witnesses in time for trial and the charges were dismissed.

Plaintiff brings this case against Defendants Sergeant Chad Eubanks and Deputies Mario Troutman, Jr., Cherish Steiger, Matthew Yates, Jacob Shaw, and Joseph Johnson alleging under 42 U.S.C. § 1983 violations of his constitutional rights.

This case is presently before the Court upon Defendants' Motion for Summary Judgment (Doc. #31); Plaintiff's Response (Doc. #35), and Plaintiff's Reply (Doc. #36).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

## II.    BACKGROUND

The events at issue in the present case began on July 29, 2016 at the Clark County Fairgrounds. Plaintiff entered the fairgrounds around 10:30 a.m. on that day, wearing a shirt that said, "f\*\*k the police." (Doc. #6, *PageID* #63) (capitalization omitted). Plaintiff alleges that later that day, he and Defendant Shaw spoke to each other. *Id.* at 64. Shortly after their conversation began, Defendants Yates and Troutman approached in a golf cart and interrupted. *Id.* The other Defendants were also seated in golf carts surrounding Plaintiff, albeit at a distance. *Id.* At Plaintiff's request, Defendants Yates and Troutman identified themselves and then asked Plaintiff to identify himself. *Id.* Plaintiff responded that he was not obligated to do so. Defendant Yates replied, "*We know who you are.*" *Id.*

According to Defendants Troutman and Shaw, fairgoers had complained to them that a male—Plaintiff Michael Wood—was using his phone to record them and their children. (Doc. #31, *PageID* #s 216, 223). The male was using profanity and was wearing a shirt with "f\*\*k the police" written on it. *Id.* Defendants Troutman and Shaw spoke with Plaintiff; "The conversation was brief, uneventful and cordial." *Id.* Afterwards, they drove away. *Id.*

Plaintiff alleges that after this initial interaction with Defendants, he was followed by an unidentified male civilian. (Doc. #6, *PageID* #64). Plaintiff did not know he was being followed until he saw the individual give a hand-held police radio to an unidentified deputy located at the end of the Youth Building. *Id.* There is no suggestion of who this individual was.

Plaintiff alleges that Dean Blair, a Clark County Fair Board member, told Defendants, "'due to Mr. Wood's [constitutionally protected] conduct, Dean Blair wanted Mr. Wood to leave the public event.'" *Id.* (alteration in original). According to Plaintiff, he "was then surrounded and detained by all of the Defendants ..., half coming from one end of the Youth Building, half coming from the other and led by Sergeant Eubanks; all participating in the obstruction and prevention of Mr. Wood's movement with intent to intimidate him and allow Fair Board member, Dean Blair, to engage Mr. Wood in a challenging manner." *Id.* at 65. Dean Blair hastily walked from almost one end of the building to the other, and when he was several meters from Plaintiff, began pointing at Plaintiff and yelling, "Where is this shirt?!"; "I want to see this shirt!"; "This is my house, you're not welcome here!"; "This is my house." *Id.* (emphasis omitted).

According to Defendants Eubanks, Troutman, Shaw, Johnson, Yates, and Steiger, they were called to the Youth Building around 5:45 p.m. (Doc. #31, *PageID* #s 213, 216, 223, 226, 229, 232). Defendants Yates, Johnson, and Troutman wore bodycams and filmed the interaction with Plaintiff. Defendant Yates began filming first (via his bodycam) in the Youth Building. His video shows that Mr. Blair approached Plaintiff first. Yates Cam #1 00:01-30. As Defendant Yates walked closer to Plaintiff and Mr. Blair, two other uniformed officers entered the Youth Building from the opposite direction. Yates Cam #1 00:25-30. As Defendant Johnson approached Plaintiff and Mr. Blair, the following conversation ensued:

> Plaintiff: Am I being detained? I don't answer questions.
> Mr. Blair: You're in my home. This is my property.
> Plaintiff: I don't answer questions.

> Mr. Blair:  This is my property.  I want you to leave.  You're
> not welcome at my home.  I want you off my grounds.

Johnson Cam 00:13-00:25; Yates Cam #1 00:25-35.

Plaintiff agreed to leave if his entrance fee ($3) was refunded.  (Doc. #6, *PageID*

#65).  Mr. Blair gave Plaintiff $5 and told him to "keep the change" and never come

back.  Johnson Cam 00:25-00:40.  Plaintiff offered, "I have change for you, sir."  Johnson

Cam 00:39-42.  But Mr. Blair refused.  Johnson Cam 00:43-53.  Mr. Blair and Plaintiff

continued to argue.

> Plaintiff:    You do realize that what I'm doing is a
> constitutionally protected activity, right?
> Mr. Blair:  Not in my home.
> Plaintiff:  Not in your home?  This isn't your home.  This is
> public property.

Johnson Cam 00:53-1:04.  Eventually, Mr. Blair asked Defendants, "What I have to say

to him?" and then reiterated to Plaintiff, "Get off my grounds."  Yates Cam 1:24-30.

Plaintiff responded, "Very well.  I'll be talking to my attorney about this."  Yates Cam

1:27-35.

After Mr. Blair and Plaintiff's conversation, something happened outside the

cameras' view, and Plaintiff said to one of the Defendants, "You ain't pushing me

nowhere.  I'll leave."  Yates Cam #1 1:35-42; Johnson Cam 1:17-1:22.  Plaintiff began to

walk towards a large open door.  Johnson Cam 1:17-1:22.  However, very shortly after he

started walking, he turned to face Defendants and asked multiple times if they took an

oath to uphold the Constitution.  Yates Cam #1 1:40-2:03; Troutman Cam #1 00:00-

00:23; Johnson Cam 1:26-43. Around the same time, Mr. Blair repeated, "you're not welcome in my house." Troutman Cam #1 00:20-25.

Plaintiff alleges that Deputy Troutman then pushed him "on the back of his right shoulder propelling his body forwards towards a large garage door opening." (Doc. #6, *PageID* #65). The "push" is not visible on any of the videos. However, Defendant Troutman described that same interaction very differently: "I put my hand on Mr. Wood's shoulder or arm to direct him to the Youth Building exit. I did not push Mr. Wood. I did not use any force. My hand was in contact with Mr. Wood for no more than a second." (Doc. #31, *PageID* #217). The cameras capture Plaintiff's response; he told Defendant Troutman not to touch him or put his hands on him. Yates Cam #1 2:00-19; Troutman Cam #1 00:15-30; Johnson Cam 1:43-1:53.

As they are walking out, one Defendant said to Plaintiff, "you've been given an order" and Plaintiff asked, "an order? is that a lawful order?" Yates Cam #1 2:10-18; Troutman Cam #1 00:30-35. And the same Defendant continued, "to vacate the property. So you're leaving." Troutman Cam #1 00:32-35. Mr. Blair repeated, "I've asked you to leave my grounds." And, Plaintiff reiterated that the fairgrounds are not Mr. Blair's and are instead public land. Yates Cam #1 2:15-25; Troutman Cam #1 00:36-48

As Plaintiff and Mr. Blair walked out of the Youth Building, Defendants remained close to them. Yates Cam #1 2:18-57. Plaintiff alleges that once outside, Mr. Blair continued to "belittle Plaintiff about the t-shirt …." (Doc. #6, *PageID* #65). As Plaintiff and Mr. Blair continued to argue, one Defendant spoke into his radio, "Everybody's

back here with Sergeant Eubanks, Mr. Blair, we're escorting … We're walking with him to the front gate." Johnson Cam 2:26-35.

While Plaintiff was walking, he announced, "Look at these thugs with badges behind me. How many is there? 1, 2, 3, 4, 5, 6 motherf**kers. Six b***h ass f**kin' pigs. F**king thugs with guns that don't uphold the United States Constitution. F**k all you. You dirty rat bastards." Yates Cam #1 2:57-3:14; Troutman Cam #1 1:15-31. As Plaintiff spoke, he stopped and turned towards the officers. A Defendant instructed him, "keep walking, sir." Yates Cam #1 3:01-05. Plaintiff then turned to Defendant Steiger and said, "And you, you're a f**king thief, I've heard about you." Yates Cam #1 3:13-17; Troutman Cam #1 1:30-35.

Plaintiff walked to a small tent and picked up a cooler and folding chair. Yates Cam #1 3:24-58. As Plaintiff stopped to pick up his belongings, a Defendant said, "this way, sir, sir." Yates Cam #1 3:26-30; Troutman Cam #1 1:44-48. Plaintiff said, "F**king thugs with badges." Yates Cam #1 3:32-38; Troutman Cam #1 1:50-2:00. And shortly thereafter, Plaintiff proclaimed, "United States Constitution doesn't apply at the Clark County fairgrounds, people." Yates Cam #1 3:41-46; Troutman Cam #1 2:00-05.

Plaintiff and Defendants then disagreed on where Plaintiff should exit. Plaintiff asserted, "I'm going out the back gate." Yates Cam #1 3:49-53; Troutman Cam #1 2:07-12. He also told them that he came in the back gate. But the officers insisted on walking to the front gate. Defendant Johnson said, "we're not going to walk all the way to the back gate" and Plaintiff replied, "Then that's your f**king fat-ass problems, mother**kers. I'm leaving." Yates Cam #1 3:55-4:02; Troutman Cam #1 2:08-21.

Plaintiff alleges that as he walked towards the back gate, "Deputies were flanking the outside of Dean Blair and Mr. Wood and surrounding them from behind …." (Doc. #6, *PageID* #s 65-66). The videos show that Plaintiff walked away and Mr. Blair walked next to him. All six Defendants followed, discussing disorderly conduct. One Defendant said, "he's talking the whole way out the door, he's still talking." Yates Cam # 4:40-50; Troutman Cam #1 3:00-05. Mr. Blair reported to Defendants, "He's disturbing my peace." Yates Cam #1 4:05-29; Troutman Cam #1 2:37-40.

Plaintiff turned around as he was walking and said to a Defendant, "Look at this bullshit. You're one big man ain't you, mother**ker." Troutman Cam #1 3:40-47.

> Plaintiff (to Defendant Troutman): I'm pressing charges against you. Battery.
> Mr. Blair: I'm your witness. That's bullshit.
> Plaintiff: He touched me. Do you know what the legal definition of battery is?
> Mr. Blair: You got a lot of mouth, boy.
> Plaintiff: Do you know what the legal definition of battery is, mother**ker? Then try to find out.

Troutman Cam #1 3:50-4:08.

At that point, one Defendant stated, "we're charging you with disorderly. Drop your bag." Troutman Cam # 4:08-5:06. Plaintiff alleges his "wrists were restrained behind his back with handcuffs and he was again detained on the order of Dean Blair." (Doc. #6, *PageID* #s 65-66). Defendants escorted Plaintiff to the Sheriff's post on the fairgrounds and searched Plaintiff and his backpack. *Id.* at 66. He was charged with disorderly conduct and obstruction of official business. *Id.* at 66, 76-79

Plaintiff, proceeding *pro se*, met with a prosecutor, Mark Ross, about the charges. Mr. Ross offered Plaintiff a deal—he would dismiss the obstruction charge and amend the disorderly conduct charge to a minor misdemeanor. *Id.* at 66, 82. Plaintiff rejected the offer. *Id.* On October 12, 2016, both charges were dismissed because "'State was unable to locate necessary lay witnesses to the incident in time for trial.'" *Id.* at 67, 84.

Plaintiff brings thirteen claims against Defendants:

Count I: Defendants "unlawfully deprived the Plaintiff of his freedoms, liberties and rights to be unmolested by Government Agents…. The Defendants' conduct deprived Plaintiff of rights, privileges and immunities secured by the Constitution or laws of the United States." *Id.* at 67-68.

Count II: Defendants conspired with Mr. Blair to violate Plaintiff's First Amendment right to freedom of speech and Fourteenth Amendment right to due process. Further, Defendants unlawfully detained Plaintiff in violation of the Fifth Amendment. *Id.* at 68-69.

Count III: Defendants conspired with Mr. Blair to obstruct and prevent Plaintiff's movement, "perpetrating disorderly conduct to facilitate disorderly conduct and violation of rights." *Id.* at 70.

Count IV: Defendants conspired with Mr. Blair to unlawfully detain Plaintiff in violation of the Fifth Amendment to allow Mr. Blair to view and confiscate Plaintiff's t-shirt in violation of Plaintiff's First Amendment right to free speech and Fourteenth Amendment right to due process. *Id.* at 71.

Count V:  Defendants unlawfully restrained Plaintiff with handcuffs behind his back, causing pain, suffering, bruising, swelling, and nerve damage to his wrists in violation of his Fourteenth Amendment right to due process.  *Id.* at 72.

Count VI:  Defendants unlawfully detained Plaintiff in violation of the Fifth Amendment.  *Id.* at 72-73.

Count VII:  Defendants intentionally inflicted emotional distress on Plaintiff.  *Id.* at 73-74.

Count VIII:  Defendants unlawfully seized Plaintiff inside the Youth Building.  (Doc. #28, *PageID* #s183-84).

Count IX:  Defendants caused Plaintiff to fear for his personal safety and life.  *Id.* at 184.

Count X:  Defendant Troutman "forcefully initiated offensive physical contact by shoving the back of Mr. Wood's right shoulder, forcing his upper body forward …."  *Id.* at 185.  Further, Defendants unlawfully used handcuffs.  *Id.*

Count XI[2]:  Defendants unlawfully restrained Plaintiff.  *Id.* at 186.

Count XII:  Defendants used unreasonable and/or excessive force against Plaintiff.  *Id.* at 185-86.

Count XIII:  Defendants' actions constitute malicious prosecution.  *Id.* at 187.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] Plaintiff mistakenly labelled two separate counts as Count X.  The Court thus renumbered the second X as XI, XI as XII, and XII as XIII.

Fed. R. Civ. P. 56.  The moving party "judgment bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Green v. Alcan Aluminum Corp.*, 198 F.3d 245 (6th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The burden then shifts to non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.  "The mere existence of a scintilla of evidence in support of [P]laintiff's position is insufficient." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

In deciding a motion for summary judgment, "credibility judgments and weighing of the evidence are prohibited." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  Instead, "all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (citation omitted).  "Thus, the facts and any inferences that can be drawn from those facts, must be viewed in the light most favorable to the non-moving party." *Bennett*, 410 F.3d at 817 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

A pro se litigant's pleadings are construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. *See Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see also Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Nonetheless, a court "may still enter summary judgment against … plaintiffs if they rely solely on the allegations in the pleadings." *McElhaney v. Elo*, No. 98-1832, 202 F.3d 269 (table), 2000 WL 32036, at *2, 2000 U.S. App. LEXIS 412, at *6 (6th Cir. 2000) (citing *Quam v. Minnehaha County Jail,* 821 F.2d 522 (8th Cir. 1987)).

## IV. DISCUSSION

To state a claim under § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Miller v. Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010) (quotation marks omitted) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). Section § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979)).

Defendants do not dispute that they were acting under the color of state law during their encounter with Plaintiff. At issue is whether Defendants deprived Plaintiff of his constitutional rights.

Plaintiff does not allege in Count I that Defendants violated any specific Constitutional right.  Instead, he alleges that they "unlawfully deprived the Plaintiff of his freedoms, liberties and rights to be unmolested by Government Agents."  (Doc. #6, *PageID* #67).  Because Plaintiff did not identify what right Defendants violated, Count I should be dismissed.

### 1.    Intentional Infliction of Emotional Distress

Defendants assert Count VII should be dismissed because there is no federal claim for intentional infliction of emotional distress (IIED).  (Doc. #31, *PageID* #204) (citing *Laning v. Doyle*, No. 3:14-cv-24, 2015 WL 710427, at *17-18, 2015 U.S. Dist. LEXIS 19424, at *45 (S.D. Ohio Feb. 18, 2015)).  Plaintiff specifically titled his IIED claim as "Claim under 42 U.S.C. § 1983 for intentional infliction of emotional distress (against all individual Defendants)."  (Doc. #6, *PageID* #73) (capitalization omitted).  Because there is no federal claim for intentional infliction of emotional distress, Count VII should be dismissed.  *See Laning*, 2015 WL 710427, at *17, 2015 U.S. Dist. LEXIS 19424, at *44 ("the fact that a plaintiff alleging a due process violation may be able to recover damages for mental distress in the context of a § 1983 suit does not mean that a separate federal cause of action exists for intentional infliction of emotional distress."); *Baxter v. Bostic*, No. 08-CV-10291, 2008 WL 3852161, at *1, 2008 U.S. Dist. LEXIS 63260, at *4 (E.D. Mich. Aug. 15, 2008) ("There is nothing know[n] to the court, however, supporting 'intentional infliction of emotional distress' as an independent federal cause of action.").

## 2.    Unlawful Seizure/Arrest

Defendants seek to combine Counts II, V, VI, and VIII into one consolidated claim for unlawful seizure under the Fourth Amendment. They assert that the Fifth and Fourteenth Amendments do not apply to this case.

Liberally construing Plaintiff's Complaint in his favor requires sorting out his claims. Plaintiff alleges in Counts II, V, and VI that Defendants unlawfully detained him and restrained him at the Clark County Fairgrounds and Clark County Jail in violation of the Fifth Amendment. But, the Fifth Amendment's due process clause is applicable to the actions of the federal government—not state actors. "'Th[e] [Fifth Amendment] constrains the power of the Federal Government to deprive any person 'of life, liberty, or property, without due process of law,' just as the Fourteenth Amendment imposes comparable constraints on the power of the States." *Pierce v. Ohio Dep't of Rehab. & Corr.*, 284 F. Supp. 2d 811, 828 (N.D. Ohio 2003) (quoting *United States v. Balsys,* 524 U.S. 666, 700, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (Stevens, J., concurring)). Thus, "The Court interprets Plaintiffs' citation to the Fifth Amendment as misidentifying the Fourteenth Amendment, which, again, affords the people protections of certain amendments (including the Fourth Amendment's protection against unreasonable searches and seizures) against the states." *Id.*

In Count II, Plaintiff alleges violations of his First Amendment right to free speech. His First Amendment claims will be addressed in more detail below.

Plaintiff alleges in Counts II and V that Defendants violated his Fourteenth Amendment right to due process. The Fourteenth Amendment provides, "[n]o State shall

… deprive any person of life, liberty, or property, without due process of law...."  U.S. CONST. amend. XIV, § 1.[3]  The Due Process Clause has a procedural component and a substantive component.  *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996).  Because Plaintiff only generally refers to "due process," it is unclear whether he claims violations of his procedural due process rights or his substantive due process rights.

"The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard 'in a meaningful manner.'"  *Id.* (quoting *Loudermill v. Cleveland Bd. of Educ.*, 721 F.2d 550, 563 (6th Cir. 1983)).  "A procedural due process limitation … does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest.  It simply requires that the government provide 'due process' before making such a decision."  *Id.* ("The goal is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process.").  Plaintiff does not allege that Defendants deprived him of the opportunity to be heard in a meaningful manner before he was seized.

"Substantive due process … serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used."  *Id.* (quotation marks omitted) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)).  Importantly, "Substantive-due-process challenges usually do not survive if a provision of the Constitution directly addresses the

---

[3] Plaintiff also refers to violations of his rights under the Fifth Amendment.  He does not refer to any specific clause.

allegedly illegal conduct at issue." *Smith v. Jefferson Cty. Bd.*, 641 F.3d 197, 217 (6th

Cir. 2011) (citing *Montgomery v. Carter Cty.*, 226 F.3d 758, 769 (6th Cir. 2000)); *see*

*also Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994)

(quoting *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871) ("Where a particular Amendment

'provides an explicit textual source of constitutional protection' against a particular sort

of government behavior, 'that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing these claims.'").

The Fourth Amendment provides an explicit textual source of constitutional

protection against unreasonable seizures—including seizures of a person. Thus, to the

extent that Plaintiff alleges that Defendants unlawfully seized him in violation of his

Fourteenth Amendment right to due process, Defendants are correct that these claims fall

more appropriately under the Fourth Amendment.

In Count VIII, Plaintiff alleges that Defendants unlawfully seized him in violation

of the Fourth Amendment. Additionally, Plaintiff alleges in Count XI that Defendants

unlawfully arrested him in violation of the Fourth Amendment.

Defendants contend that Plaintiff's unlawful seizure/arrest claims fail because

there was probable cause to arrest him. (Doc. #31, *PageID* #204). But, before reaching

that inquiry, the parties dispute at what point Plaintiff was seized. The parties agree that

Defendants seized Plaintiff when they handcuffed him. However, Plaintiff asserts that he

was seized long before that, when Defendants surrounded him in the Youth Building—

"obstructing and preventing Mr. Wood's freedom of movement … with intent to

intimidate him, by an overwhelming show of force, and allow Fair Board Member, Dean

Blair, to engage Mr. Wood in a hostile and challenging manner ….." (Doc. #35, *PageID* #246).  Defendants insist that there was no Fourth Amendment seizure until Plaintiff was handcuffed.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ''by means of physical force or show of authority,'' terminates or restrains his freedom of movement, *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), '*through means intentionally applied,*' *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (emphasis in original)."  *Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405, 168 L.Ed.2d 132 (2007).  In this case, the question is whether Plaintiff was seized by Defendants' show of authority before he was handcuffed.[4]  A seizure occurs in response to authority "if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[.]'"  *Id.* at 255, 127 S.Ct. at 2405 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)); *see also California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) ("the test for existence of a 'show of authority' is an objective one:  not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a

---

[4] "Issues of consent, seizure, and reasonable suspicion are questions of law …."  *United States v. Ali*, 437 F. App'x 439, 442 (6th Cir. 2011).

reasonable person.").  But, "when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter[.]" *Brendlin*, 551 U.S. at 255, 127 S.Ct. at 2405-06, (quoting *Bostick,* 501 U.S. at 434, 111 S.Ct. 2382); (citing *United States v. Drayton*, 536 U.S. 194, 202, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002)).  There are several circumstances indicative of a seizure—for example, the threatening presence of several officers; physical touching or display of a weapon by an officer, or use of language or tone of voice by an officer that suggests compliance with his request might be compelled. *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (citing *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870).  Importantly, "there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin*, 551 U.S. at 255, 127 S.Ct. at 2405-06 (citations omitted).

At the Youth Center, Defendants encircled Plaintiff and Mr. Blair.  Plaintiff asked several times if he was being detained and if he committed a crime.  Yates Cam #1 00:25-35.  Defendants do not appear to respond to Plaintiff.  Although the significant presence of six law enforcement officers is indicative of a seizure, Plaintiff ultimately agreed to leave if his entrance fee was refunded.  *See Jones*, 562 F.3d at 772.

When Plaintiff decided to leave, he began to walk towards an exit but stopped to ask Defendants several times if they took an oath to uphold the United States Constitution.  Johnson Cam 1:17-1:22; Yates Cam #1 1:40-2:03; Troutman Cam #1 00:00-23.  Although outside the camera view, Plaintiff alleges that Defendant Troutman

pushed him on his back right shoulder "propelling his body forward towards a large garage opening." (Doc. #6, *PageID* #65).

Defendant Troutman described their interaction much differently: "I put my hand on Mr. Wood's shoulder or arm to direct him to the Youth Building exit. I did not push Mr. Wood. I did not use any force. My hand was in contact with Mr. Wood for no more than a second." (Doc. #31, *PageID* #217). In response, Plaintiff told Defendant Troutman not to touch him or put his hands on him. Yates Cam #1 2:00-19; Troutman Cam #1 00:30. Although physical touching can be an indicator of seizure, *Jones*, 562 F.3d at 772, Plaintiff was not seized at this point because "police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes." *Salmon v. Blesser*, 802 F.3d 249, 253 (2nd Cir. 2015). As evidenced by Plaintiff's next actions—namely, walking to pick up his belongings and then walking to the back gate—Plaintiff was otherwise free to go where he wanted.

Yet, some of Defendants' "orders" are indicative of seizure. For instance, as they are walking out of the Youth Center, one officer said, "you've been given an order … to vacate the property. So you're leaving." Yates Cam #1 2:10-18; Troutman Cam #1 00:30-35. When Plaintiff later stopped, a Defendant instructed him to "keep walking, sir." Yates Cam #1 3:01-05. Defendants also directed Plaintiff to exit at the front gate. Johnson Cam 3:28-42. But Plaintiff insisted on going out the back.

Despite Defendants' show of authority, Plaintiff did not submit. He declared he was leaving, despite being surrounded. He walked to get his belongings before exiting. And, he chose which direction he would exit. "Irrespective of whether a reasonable person in [Plaintiff's] situation would have felt free to leave [or terminate the encounter], he clearly did not yield and [Plaintiff's] seizure was not effectuated …" until Defendants arrested him. *Jones*, 562 F.3d at 774-75 (footnote omitted). Accordingly, Plaintiff's claims for unlawful seizure before his arrest fail.

This leads back to Defendants original contention that Plaintiff's unlawful seizure/arrest claims fail because there was probable cause to arrest Plaintiff. (Doc. #31, *PageID* #204). "'[I]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause.'" *Sanilac Cty.*, 606 F.3d at 256 (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)); *see also Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) ("A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.") (citing *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005); *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009)). "'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. McClain,* 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir. 1993) (en banc)). To determine whether probable cause existed, the court must consider the totality of the circumstances and "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Sanilac Cty.*, 606 F.3d at 256 (quotation

marks omitted) (quoting *Logsdon v. Hains,* 492 F.3d 334, 341 (6th Cir. 2007)); *see Sykes,* 625 F.3d at 306.

At the time of the arrest, Plaintiff was charged with disorderly conduct under O.R.C. § 2917.11(A)(2) and obstructing official business under O.R.C. § 2921.31. However, in their Motion for Summary Judgment, Defendants contend that there was "ample probable cause" to arrest Plaintiff for either disorderly conduct under O.R.C. § 2917.11 or littering under O.R.C. § 3767.32(A).

Under Ohio Rev. Code § 2917.11(A),

No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
1.   Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
2.   Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;
3.   Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response …

Plaintiff contends that Defendants lacked probable cause to arrest him for disorderly conduct because his statements are constitutionally protected speech and therefore cannot be criminalized.

Although "First Amendment protection is very expansive," *Sandul v. Larion*, 119 F.3d 1250, 1254-55 (6th Cir. 1997), there is a very limited exception for "fighting words"—"those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). "Fighting words are words that are likely to cause an average

person to react thus causing a breach of the peace." *Sandul*, 119 F.3d at 1255 (citing *Chaplinsky*, 315 U.S. at 574, 62 S.Ct. at 770). "They are words which an onlooker would consider a 'direct personal insult or an invitation to exchange fisticuffs.'" *Id.* at 1255 (quoting *Texas v. Johnson*, 491 U.S. 397, 409, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989)).

Defendants contend that the circumstances surrounding Plaintiff's statements establish that they are "fighting words" and are therefore not constitutionally protected. Defendants emphasize five specific comments:

> "Look at these thugs with badges behind me…1, 2, 3, 4, 5, 6 motherf**kers…. Six b***h ass f**kin' pigs…. F**king thugs with guns that don't uphold the U[nited] S[tates]. Constitution… F**k all you. You dirty rat bastards."

> Plaintiff got in Deputy Steiger's face, pointed at her and called her a "f**king thief."

> Plaintiff refused to follow instructions. When Deputy Johnson asks Plaintiff to walk towards the front gate. Plaintiff refuses and states. "That's your f**king fat-ass problem[s], mother**ker."

> Plaintiff taunted the deputies when he said "Look at this bullshit. You're one big man ain't you, mother**ker."

> Finally, Plaintiff screamed and cursed at Mr. Blair: "Do you know what the legal definition of battery is, mother**ker?"

(Doc. #31, *PageID* #206) (citations omitted). Defendants assert that Plaintiff "intended to personally offend the officers. And, Plaintiff directed his vulgarities and insults at the deputies from close range." *Id.* at 207.

The first statement that Defendants point to is not directed at a specific officer; it is directed at all six Defendants. Further, although Defendants claim Plaintiff "got in [Defendant] Steiger's face," the videos show that he stopped walking, turned around, saw Defendant Steiger—who was behind him and between two other Defendants—and said, "And you, you're a f**king thief, I've heard about you." Johnson Cam 2:50-56; Yates Cam #1 3:13-17; Troutman Cam #1 1:30-35.

The next phrase Defendants point to relates to Plaintiff's choice of exit. In context, Plaintiff and Defendants disagreed on where Plaintiff should exit the fairground. Plaintiff asserted, "I'm going out the back gate." Yates Cam #1 3:49-53; Troutman Cam #1 2:07-12. Plaintiff asked Defendants if it mattered which gate he entered, one Defendant said yes, and Plaintiff told them that he entered through the back gate. Defendants, however, insisted on escorting Plaintiff to the front gate. Defendant Johnson said, "we're not going to walk all the way to the back gate" and Plaintiff replied, "Then that's your f**king fat-ass problems, motherf**ker. I'm leaving." Yates Cam #1 3:55-4:02; Troutman Cam #1 2:08-21.

The next statement occurred as an announcement was playing over a loudspeaker at the fair, and it is difficult to hear. The video shows that Plaintiff and Mr. Blair were walking, Plaintiff stopped, turned around, and said, "Look at this bullshit. You're one big man, ain't you, mother**ker." Troutman Cam #1 3:37-3:50. Shortly thereafter, as Plaintiff and Mr. Blair continued to walk, Defendant Troutman walked closer to them, in between the two but slightly behind. Plaintiff addressed Defendant Troutman:

      Plaintiff: I'm pressing charges against you.

> Troutman: What are you talking about?
> Plaintiff: Battery.
> Troutman: [unintelligible]
> Mr. Blair: I'm your witness. That's bullshit.
> Plaintiff: He touched me. Do you know what the legal definition of battery is?
> Mr. Blair: You got a lot of mouth, boy.
> Plaintiff: Do you know what the legal definition of battery is, mother**ker?
> Mr. Blair: [unintelligible]. You got your mouth running ….
> Plaintiff: Then try to find out.

Troutman Cam #1 3:50-4:08.

Defendants indicate that Mr. Blair was only two to three feet away from Plaintiff when Plaintiff said, "Do you know what the legal definition of battery is, mother**ker?" (Doc. #31, *PageID* #206). Defendants further assert that Plaintiff's "screaming and cursing in the face of Dean Blair, was aggressive and threatening …." (Doc. #36, *PageID* #272). But the exchange was between Mr. Blair, Defendant Troutman, and Plaintiff. And, when Plaintiff made the statement, Mr. Blair was walking ahead of Plaintiff and Defendant Troutman was in between Mr. Blair and Plaintiff. Plaintiff's statement is in response to Mr. Blair telling Defendant Troutman, "I'm your witness. That's bullshit." Plaintiff did not step closer to Mr. Blair, move his arms, or otherwise threaten Mr. Blair.

When viewed in a light most favorable to Plaintiff, his comments to Defendants and Mr. Blair do not constitute fighting words and therefore constitute constitutionally protected speech. *See Brown v. City of Warren*, No. 4:05 CV 2439, 2007 WL 188360, at *9, 2007 U.S. Dist. LEXIS 4319 (N.D. Ohio Jan. 22, 2007) ("Though 'fighting words' or 'words which by their very utterance inflict injury or tend to incite an immediate breach

of the peace' are not afforded constitutional protection, generally something more than profanity is required.") (citing *Chaplinsky*, 315 U.S. at 571-72 ). "There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment." *McCurdy v. Montgomery Cty., Ohio*, 240 F.3d 512, 520 (6th Cir. 2001) (citing *Glasson v. City of Louisville,* 518 F.2d 899, 904 (6th Cir. 1975); *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998); *Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir. 1997)) ("[T]he First Amendment right to criticize public officials is well-established and supported by ample case law. Furthermore, it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."); *Duran v. City of Douglas,* 904 F.2d 1372, 1378 (9th Cir. 1990). Indeed, "government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely, anyone who takes an oath of office knows—or should know—that much." *Duran*, 904 F.2d at 1378. "In *Houston v. Hill,* 482 U.S. 451, 462, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1986), the Supreme Court recognized that the 'fighting words' doctrine may be limited in the case of communications addressed to properly trained police officers because police officers are expected to exercise greater restraint in their response than the average citizen." *Greene v. Barber*, 310 F.3d 889, 896 (6th Cir. 2002). Thus, a person's "characterization of [a lieutenant] as an 'asshole' was not egregious enough to trigger application of the 'fighting words' doctrine." *Id.*; *see also Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019) ("a citizen who raises

her middle finger engages in speech protected by the First Amendment.") (citing *Sandul*, 119 F.3d at 1255) (other citation omitted). Likewise, a "'torrent of profanities' directed at the officers"—including "f**k police" and "you guys ain't shit"—did not rise to the level of "fighting words" and therefore constituted protected speech under the First Amendment. *See Brown*, 2007 WL 188360, at *2, *9, 2007 U.S. Dist. LEXIS 4319. Plaintiff's statements to Defendants, although certainly disrespectful and insulting at times, do not rise to the level of fighting words and are thus afforded constitutional protection.[5]

"Significantly, an officer may not base his probable cause determination on speech protected by the First Amendment." *Kinkus v. Village of Yorkville*, 453 F.Supp.3d 1009, 1014 (S.D. Ohio 2006) (Marbley, D.J.). Because the videos do not confirm Defendants' allegations that Plaintiff acted aggressively and threatened Mr. Blair, and because Defendants basis for charging Plaintiff with disorderly conduct rests upon Plaintiff's speech and Plaintiff's speech does not constitute "fighting words," Defendants lacked probable cause to arrest Plaintiff for disorderly conduct.

But, Defendants insist, probable cause exists to arrest Plaintiff for littering. O.R.C. § 3767.32(A) provides, "No person, regardless of intent, shall deposit litter or cause litter to be deposited on any public property, on private property not owned by the

---

[5] In certain situations, if speech transforms into verbal conduct, then the conduct can constitutionally be criminalized. For example, "When a person continues to interfere with a police officer's investigation and questioning of a third person, such verbal conduct is not entitled to First Amendment protection." *Underwood v. Wasko*, No. 2:11-CV-171, 2012 WL 4087411, at *6, 2012 U.S. Dist. LEXIS 132194 (S.D. Ohio Sept. 17, 2012) (citing *King v. Ambs,* 519 F.3d 607, 611 (6th Cir. 2008)). In the present case, Plaintiff did not interfere with a police officer's investigation and questioning of another person.

person, or in or on waters of the state …."[6] And, "litter" is defined as "garbage, trash, waste, rubbish, ashes, cans, bottles, wire, paper, cartons, boxes, automobile parts, furniture, glass, or anything else of an unsightly or unsanitary nature." O.R.C. § 3767.32(D)(1). Defendants contend that as Plaintiff was walking, he threw money on the ground. That money, Defendants assert, falls under the category of paper. The videos show that Mr. Blair and Plaintiff argued about money:

> Mr. Blair: You got your money back, leave.
> Plaintiff: Is that what it is?
> Mr. Blair: You got your money back, leave.
> Plaintiff: F**k your $5, dude. $5 ain't shit to me, bro.

Troutman Cam 1:00-15; Yates Cam #1 2:40-56; Johnson Cam 2:18-33. In one video, as Plaintiff is speaking, part of Plaintiff's arm can be seen going up. Troutman Cam 1:00-15. In another video, what could be folded dollar bills (or a folded dollar bill) flies over Defendant Troutman's shoulder. Yates Cam #1 2:40-56. Significantly, however, none of the Defendants mention this incident in their declarations. (Doc. #31, *PageID* #s 213-34). There is no reference to it in the incident report or Defendant Troutman's complaint. *Id.* at 219-22; 35 at 264. Defendants rely solely on the videos. But these videos do not show the money leave Plaintiff's hand and do not show the money landing on the ground. To the extent that Plaintiff threw or dropped money and that throwing or dropping money is littering, when viewed in a light most favorable to Plaintiff, this evidence does not

---

[6] Under Ohio Rev. Code § 3767.99(C), "Whoever violates section … 3767.32 … is guilty of a misdemeanor of the third degree. The sentencing court may, in addition to or in lieu of the penalty provided in this division, require a person who violates section 3767.32 of the Revised Code to remove litter from any public or private property, or in or on waters of the state."

establish probable cause to arrest Plaintiff for littering. Accordingly, Defendants have not established that they had probable cause to arrest Plaintiff.

Defendants maintain, even if there was not probable cause to arrest Plaintiff, Defendants are entitled to qualified immunity. (Doc. #31, *PageID* #208). Qualified immunity "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006)). "The doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 394-95 (quoting *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007); *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). There is a two-part test to determine whether qualified immunity applies: "first, we determine whether a clearly established constitutional or statutory right has been violated; and second, we ascertain, pursuant to an objective standard, whether the official acted unreasonably in light of the clearly established right." *McCurdy*, 240 F.3d at 520 (citing *Bloch*, 156 F.3d at 678).

Defendants assert that even if there was not probable cause to arrest Plaintiff, Defendants are entitled to qualified immunity on Plaintiff's unlawful arrest claim because "they 'reasonably but mistakenly conclude[d] that probable cause [wa]s present.'" (Doc. #31, *PageID* #208) (alteration in original) (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 591, 199 L.Ed.2d 453 (2018)). "Regarding claims of false arrest, '[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law

and the information possessed at the time by the arresting agent.'" *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011) (quoting *Harris v. Bornhorst,* 513 F.3d 503, 511 (6th Cir. 2008)).

It is—and was at the time of Plaintiff's arrest—well established that "an officer may not base his probable cause determination on speech protected by the First Amendment." *Kinkus*, 453 F.Supp.3d at 1014. And, "[s]ince the day the ink dried on the Bill of Rights, '[t]he right of an American citizen to criticize public officials and policies ... is 'the central meaning of the First Amendment.'" *McCurdy*, 240 F.3d at 520 (quoting *Glasson*, 518 F.2d at 904) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 273, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)); *see Barrett*, 130 F.3d at 263 ("Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment."). Accordingly, Defendants are not entitled to qualified immunity.

### 3. Excessive Force

Defendants assert that Counts IX, X, and XII should be addressed as claims for excessive force because there is no constitutional claim for assault and battery. The Court agrees. *See Bowman v. Canapp*, No. CIV.A 1:09-CV-149-R, 2010 WL 686368, at *1, 2010 U.S. Dist. LEXIS 15554 (W.D. Ky. Feb. 23, 2010) ("There is no federal cause of action for 'assault.'").

Additionally, Defendants contend that there is no evidence to support Plaintiff's excessive force claims. (Doc. #31, *PageID* #209). Plaintiff's excessive force allegations focus on three specific interactions. First, in Count IX, Plaintiff alleges that while he was

surrounded by all of the Defendants, he "feared that if he continued to resist the commands of Dean Blair, to leave the fairgrounds, by informing him that his speech/expression/conduct were guaranteed and protected by the Constitution, the Defendants would engage him with physically offensive bodily contact and harm."  (Doc. #28, *PageID* #184).  Second, Plaintiff alleges in Count X, that when he tried to return $2.00 to Mr. Blair, "Deputy Mario Troutman, Jr. forcefully initiated offensive physical contact by shoving the back of Mr. Wood's right shoulder, forcing his upper body forward towards the large garage door opening."  *Id.* at 185.  Third, in Count XI, Plaintiff alleges that he "was never informed that he was under arrest or instructed/requested to place his hands behind his back."  *Id.* at 186.  "The force us[ed] to remove Mr. Wood's possessions from the grasp of his hands, the back-pack from his body and to pull and twist his arms behind his back in order to effectuate the unlawful arrest was unreasonable and/or excessive."  *Id.*

"[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard …."  *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871.  Determining whether the force used to effect a seizure is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (quotations marks omitted) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)).  The "question is whether the officers' actions are 'objectively reasonable' in light of the facts

and circumstances confronting them, *without regard to the underlying intent or motivation*...." *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004) (quotation marks omitted) (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). There are several factors to consider, including "(1) the severity of the crime at issue, (2) the immediate threat the suspect poses to the safety of the officer or others, (3) the suspect's resistance, if any, and (4) the possibility of flight." *Id.* (citation omitted). Importantly, a "seizure must occur before an excessive force claim is cognizable under the Fourth Amendment." *Id.* at 492 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 844-45 & n. 7, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). For the reasons explained above, Defendants did not "seize" Plaintiff until he was handcuffed.

In Count IX, Plaintiff alleges that he feared if he continued to resist Mr. Blair's order to leave the fairground, Defendants would use "offensive bodily contact and harm," and he "feared that his personal safety, and potentially his life was threatened/in danger." (Doc. #28, *PageID* #184). However, Plaintiff does not allege that Defendants threatened him. At that time, for the reasons explained above, Plaintiff was not "seized" and thus, he does not have a cognizable claim to excessive force under the Fourth Amendment.

Turning to Count X, Plaintiff alleges that "Deputy Mario Troutman, Jr. forcefully initiated offensive physical contact by shoving the back of Mr. Wood's right shoulder, forcing his upper body forward towards the large garage door opening." *Id.* at 185. According to Defendant Troutman, "I put my hand on Mr. Wood's shoulder or arm to direct him to the Youth Building exit. I did not push Mr. Wood. I did not use any force. My hand was in contact with Mr. Wood for no more than a second." (Doc. #31, *PageID*

#217).  The videos do not show Defendant Troutman pushing him.  The videos only show Plaintiff telling Defendant Troutman not to touch or put his hands on him.  Johnson Cam 1:40-52; Troutman Cam #1 00:23-30.  To the extent that Plaintiff was pushed, there is no evidence that it had any effect on his body.  The videos do not show him launched in any direction.  Further, as explained above, Plaintiff was not "seized" at this time and therefore does not set forth a cognizable claim for excessive force under the Fourth Amendment.

Turning to his arrest, although Plaintiff alleges he was never informed that he was under arrest or instructed to place his hands behind his back, the videos clearly contradict him.  One Defendant informed Plaintiff he was charging him for disorderly.  Troutman Cam #1 4:05-12.  Shortly thereafter another Defendant tells Plaintiff he is under arrest for disorderly conduct and to drop his bag.  Troutman Cam #1 4:12-22; Yates Cam #1 5:50-6:6:12.  There is no evidence that the arresting officers used more force than was necessary to effectuate the arrest.  The officers did not slam Plaintiff into a wall or the ground and did not slap or otherwise hit him.  To the extent Defendants pushed or shoved Plaintiff, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396-97, 109 S.Ct. at 1872 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)).  Defendants' actions under the circumstances do not rise to the level of excessive force prohibited by the Fourth Amendment.  Accordingly, summary judgment should be granted as to Counts IX, X, and XII.

### 4.      First Amendment Claim

Plaintiff alleges in Count IV that Defendants retaliated in violation of his First Amendment right to free speech.  To establish a First Amendment retaliation claim, the plaintiff must demonstrate three elements:  (1) "he engaged in constitutionally protected speech"; (2) "he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech"; and (3) "the protected speech was a substantial or motivating factor in the decision to take the adverse action."  *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011) (citing *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 768 (6th Cir. 2010)).

Plaintiff—by wearing a shirt that said "f**k the police"—engaged in constitutionally protected speech.  "It is a well-established that 'absent a more particularized and compelling reason for its actions, [a] State may not, consistently with the First and Fourteenth Amendments, make the simple public display ... of [a] four-letter expletive a criminal offense.'"  *Sandul*, 119 F.3d at 1254-55 (quoting *Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 1789, 29 L.Ed.2d 284 (1971)).

> In *Cohen,* the words of individual expression were also "f—k you."  The *Cohen* Court explained why such language is entitled to First Amendment protection although it appears to have little redeeming value:
>
> while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric.  Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.

*Id.* (quoting *Cohen*, 403 U.S. at 26, 91 S.Ct. at 1789).

This leads to the second element required to establish a First Amendment retaliation claim, the plaintiff must show "he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech." *Westmoreland*, 662 F.3d at 718 (citing *Pucci*, 628 F.3d at 768). Plaintiff successfully showed that he suffered an adverse action because of his shirt. As a result of wearing a shirt that said "f**k the police," Mr. Blair and six police officers surrounded Plaintiff. Mr. Blair repeatedly asked him to leave, Defendants encircled him, and Defendants escorted him through the fairgrounds. Defendants' actions would deter an ordinary person from wearing that shirt. *See Cruise-Gulyas*, 918 F.3d at 497 ("In view of the reality that something 'as trivial as failing to hold a birthday party for a public employee' amounts to retaliation if done because the employee exercised his speech rights, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), an unwarranted police stop, a far greater intrusion on liberty, must satisfy the test too.").

Finally, the third element to establish a First Amendment retaliation claim; Plaintiff must show "the protected speech was a substantial or motivating factor in the decision to take the adverse action." *Westmoreland*, 662 F.3d at 718 (citation omitted). Defendants assert that they received complaints from fairgoers that a man who was wearing a shirt that said "f**k the police" was using profanity and was recording them with his phone. Further, according to the incident report, "Dean Blair advised due to [Plaintff's] actions he wanted him to leave the Fair grounds." (Doc. #31, *PageID* #22)2. It is not clear from the record what "actions" warranted Plaintiff's removal. But, Plaintiff

alleges that Mr. Blair, when first approaching Plaintiff, yelled "Where is this shirt?!"; "I want to see this shirt!" (Doc. #6, *PageID* #65). Plaintiff's allegations, if proven at trial, could be taken by a reasonable jury to support his claim that Defendants were motivated to surround and require him to leave in part because he wore a shirt that said "f**k the police."

### 5. Malicious Prosecution

Defendants contend that Plaintiff's malicious prosecution claims fail because there was probable cause to arrest Plaintiff. (Doc. #31, *PageID* #204). To succeed on a malicious prosecution claim under § 1983, when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove four elements. First, "the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute.'" *Sykes*, 625 F.3d at 308-09 (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002)). Second, "the plaintiff must show that there was a lack of probable cause for the criminal prosecution." *Id.* (citing *Fox*, 489 F.3d at 237; *Voyticky*, 412 F.3d at 675). Third, "the plaintiff must show that, 'as a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of liberty,' as understood in our Fourth Amendment jurisprudence, apart from the initial seizure." *Id.* (citing *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007); *Gregory v. City of Louisville,* 444 F.3d 725, 748-50 (6th Cir. 2006); *cf. Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). Finally, "the

criminal proceeding must have been resolved in the plaintiff's favor." *Id.* (citing *Heck,* 512 U.S. at 484, 114 S.Ct. 2364).

Plaintiff cannot establish that Defendants made, influenced, or participated in the decision to prosecute. "In order 'to be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating.'" *Day v. DeLong*, 358 F. Supp. 3d 687, 705-06 (S.D. Ohio 2019) (quoting *Hunt v. Wayne County*, No. 1-10-0035, 2012 WL 279482, *4, 2012 U.S. Dist. LEXIS 11126 (M.D. Tenn. Jan. 31, 2012)). "This is true even for officers who 'urge prosecution, but who have no effect on the probable cause determination by the prosecutor.'" *Id.* (quoting *Jorg v. City of Cincinnati*, 145 F. App'x 143, 149 (6th Cir. 2005)). Although Defendants completed a police report and signed a criminal complaint, they did not make the decision to prosecute. Instead, that determination was left to the prosecutor. Consequently, Defendants cannot be held liable for malicious prosecution, and summary judgment should be granted as to Count XIII.

### 6.    Conspiracy

Last, Defendants contend that Plaintiff's conspiracy claim fails as a matter of law. (Doc. #31, *PageID* #211). The Sixth Circuit set forth the standard for proving a civil conspiracy in *Hooks v. Hooks*:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the

general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

771 F.2d 935, 943-44 (6th Cir. 1985). "'It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.'" *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

Although Plaintiff does not name Dean Blair as a Defendant, Plaintiff alleges that Defendants conspired with him in several of his claims against Defendants. For example, Plaintiff alleges in Count II that Defendants "conspired with Fair Board member, Dean Blair, to engage Plaintiff in a challenging manner, … in violation of the Fifth Amendment, First Amendment Right to Freedom of Speech and Fourteenth Amendment to Due Process." (Doc. #6, *PageID* #68). Plaintiff titled Count III "Claim under 42 U.S.C. § 1983 for Civil Conspiracy (Against all individual Defendants)". *Id.* at 69 (capitalization omitted). Plaintiff alleges that "Clark County Fair Board member, Dean Blair, advised the Defendants that 'due to the [constitutionally protected] actions of Plaintiff, Dean Blair wanted Plaintiff to leave the fair.'" *Id.* at 70. "The individual Defendants, without privilege to do so, each agreed to participate in obstructing and preventing Plaintiff's movement on the Clark County Fairgrounds, perpetrating disorderly conduct to facilitate disorderly conduct and violation of rights." *Id.* "The link between the 'private party,' Fair Board member, Dean Blair, and the State, all Defendants named in this action, was direct and substantial." *Id.*

There are no specific allegations linking Defendants and Mr. Blair to an alleged conspiracy to deprive Plaintiff of his rights. Plaintiff's generic statements are not factual allegations; they are instead legal conclusions unsupported by any specific allegations. For instance, Plaintiff's allegation that there is a "direct and substantial" link between Mr. Blair and Defendants is not supported by any other factual allegation. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 400-01 (6th Cir. 2016) (finding the statement that "all Defendants knowingly wrote and/or solicited and/or facilitated and/or processed and/or presented false statements against Plaintiff which falsely informed and guided a Grand Jury to indict her of crimes she never committed" to be a broad, legal conclusion unsupported by specific allegations) (citing *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563-64 (6th Cir. 2011)) (rejecting the statement that "Defendants have conspired among themselves and with others unnamed … to knowing and intentionally deny [Plaintiff's] constitutional rights" as a legal conclusion "masquerading as factual allegation[]"). Therefore, Plaintiff's claim for conspiracy fails and Defendants' Motion for Summary Judgment should be granted as to Count II and III.

### IT IS THEREFORE RECOMMENDED THAT:

Defendants' Motion for Summary Judgment (Doc. #31) be denied in part, as to Count IV—First Amendment retaliation—and Count XI—unlawful arrest—and granted in part, as to Counts I, II, III, V, VI, VII, VIII, IX, X, XII, XIII.

February 11, 2020                         *s/Sharon L. Ovington*
                                          Sharon L. Ovington
                                          United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).