**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Michael A. Wood,**

                            *Plaintiff,*

**v.**                                                        **Case No. 3:18-cv-0168**
                                                             **Judge Thomas M. Rose**

**Sgt. Chad Eubanks,** *et al.,*

                            *Defendants.*

---

**AMENDED [1] ENTRY AND ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CHAD EUBANKS, JOSEPH JOHNSON, JACOB SHAW, CHERISH STEIGER, MARIO TROUTMAN, JR, MATTHEW YATES, ECF 31, DENYING PLAINTIFF'S MOTION FOR LEAVE TO MANUALLY FILE CERTAIN ITEMS, ECF 44, DENYING MOTION FOR EXTENSION OF TIME , ECF 52 AND TERMINATING CASE.**

---

In the instant case, Plaintiff basically urges the Court to conclude that wearing a shirt that proclaims "F**K THE POLICE" gives the wearer a cause of action against any officer who uses force against the wearer no matter what reasons the officers have for their actions.   Unfortunately for Plaintiff, Officers responding to a request to remove a trespasser enjoy qualified immunity from suits alleging a reasonable amount of force to effectuate a lawful arrest.

Pending before the Court are a Motion for Summary Judgment by Defendants Chad Eubanks, Joseph Johnson, Jacob Shaw, Cherish Steiger, Mario Troutman, Jr, Matthew Yates, (ECF

---

[1] Amended to correct caption.

31), a Report and Recommendation from Magistrate Judge Sharon L. Ovington, (ECF 39), and Objections to the Report and Recommendation from all parties. (ECF 40, 41.) Additionally, Plaintiff has filed a Motion for Leave to Manually File Certain Items, (ECF 44), and a Motion for Extension of Time. (ECF 52.)

## I.    Background

On July 29, 2016 Plaintiff Michael A. Woods entered the Clark County Fairgrounds around 10:30 a.m., wearing a shirt that said, "F**k the Police." (ECF 6, PageID 63).[2]

At approximately 1:45 p.m., the command post for the Sheriff's Department received a call from the Fire Barn that Michael Wood was walking around the fairgrounds with a "F**k the Police" shirt on and was making people feel uncomfortable. (Eubanks Decl., ¶ 6). Similarly, fairgoers complained to both Deputy Troutman and Deputy Shaw that a male was using his phone to record them and their children. (Troutman Decl,, ¶ 5-6; Shaw Decl., ¶ 5). They also complained the male wearing the "F**k the Police" t-shirt was also using profanity. (Id.). Deputies Troutman and Shaw witnessed Plaintiff using his phone to video fairgoers including children. (Id.).

Plaintiff alleges he and Defendant Jacob Shaw engaged conversation. (Id. at 64.) Shortly after their conversation began, Defendants Matthew Yates and Mario Troutman approached in a golf cart and interrupted. (Id.) The other Defendants were also seated in golf carts surrounding Plaintiff, albeit at a distance. (Id.) At Plaintiff's request, Defendants Yates and Troutman identified themselves and then asked Plaintiff to identify himself. (Id.) Plaintiff responded that he was not obligated to do so. Defendant Yates replied, "We know who you are." (Id.)

---

[2] The Court is declining to include the "uc" in the vulgarity that was on Plaintiff's shirt and or to fully transcribe the various other choice words Plaintiff employed.

Defendants Troutman and Shaw spoke with Plaintiff; "The conversation was brief, uneventful and cordial." (ECF 31, PageID 216, 223).   Afterwards, they drove away. (Id.)

At approximately 5:45 p.m. on July 29, Defendants were called to the Youth Building. (Eubanks Decl., ¶ 8; Troutman Decl., ¶ 8; Shaw Decl., ¶ 8; Johnson Decl., ¶ 5; Yates Decl., ¶ 5; Steiger Decl., ¶ 5, ECF 31, PageID 213, 216, 223, 226, 229, 232).   Defendants Yates, Johnson, and Troutman wore bodycams and filmed the interaction with Plaintiff via bodycams.   Defendant Yates began filming first.   His video shows that in the Youth Building Dean Blair, the Executive Director of the Clark County Fairgrounds approached Plaintiff first. Yates Cam #1 00:01-30.   As Defendant Yates walked closer to Plaintiff and Blair, two other uniformed officers entered the Youth Building from the opposite direction. Yates Cam #1 00:25-30.

Blair asked Plaintiff to leave the fairgrounds. (Johnson Decl., Exhibit 1, hereinafter "Johnson Body Cam," at :20; Yates Decl., Exhibit 1, hereinafter "Yates Body Cam," at :40). Plaintiff asked for his fair entrance money back and Blair refunded Plaintiff's entrance fee. (Id. at :38 and 1:00, respectively).   Blair again asked Plaintiff to leave. (Id. at :44 and 1:04, 1:27, respectively).   Plaintiff agreed to leave. (Id. at 1:10-1:21 and 1:30, respectively; Complaint, ECF 6, ¶ 20, PageID   65).   Before he begins to leave, Plaintiff takes a step toward Deputy Steiger and states: "You ain't pushin' me nowhere, I'll leave." (Johnson Body Cam, 1:17- 1:20).

Plaintiff then turned towards the Defendants and directs his attention toward them:

> Plaintiff: Am I being detained?   I don't answer questions.
>
> Blair: You're in my home.   This is my property.
>
> Plaintiff: I don't answer questions.
>
> Blair: This is my property.   I want you to leave.   You're not welcome at my home.   I want you off my grounds.

Johnson Cam 00:13-00:25; Yates Cam #1 00:25-35.

Plaintiff agreed to leave if his three dollar entrance fee was refunded. (ECF 6, PageID 65). Blair gave Plaintiff $5 and told him to "keep the change" and never come back. Johnson Cam 00:25-00:40. Plaintiff offered, "I have change for you, sir." Johnson Cam 00:39-42. Blair refused. Johnson Cam 00:43-53. Plaintiff began walking out of the Youth Building and onto a thoroughfare. As he walked, he argued and shouted with Blair. (Johnson Body Cam, 1:40 – 2:30; Yates Body Cam, 1:45 – 2:57; Troutman Decl., Exhibit 1, hereinafter "Troutman Body Cam," at :21 – 1:16). During this time, Plaintiff throws his refunded money on the ground (Yates Body Cam at 2:47) and then states to Blair, "Five dollars ain't shit to me, bro…Who the f**k do you think you are?" (Troutman Body Cam, 1:10-1:13).

Blair and Plaintiff continued to argue:

> Plaintiff: You do realize that what I'm doing is a constitutionally protected activity, right?
>
> Blair: Not in my home.
>
> Plaintiff: Not in your home? This isn't your home. This is public property.

Johnson Cam 00:53-1:04. Eventually, Blair asked Defendants, "What I have to say to him?" and then reiterated to Plaintiff, "Get off my grounds." Yates Cam 1:24-30. Plaintiff responded, "Very well. I'll be talking to my attorney about this." Yates Cam 1:27-35. After Blair and Plaintiff's conversation, something happened outside the cameras' view, and Plaintiff said to one of the Defendants, "You ain't pushing me nowhere. I'll leave." Yates Cam #1 1:35-42; Johnson Cam 1:17-1:22.

Plaintiff began to walk towards a large open door. Johnson Cam 1:17-1:22.   However, very shortly after he started walking, he turned to face Defendants and asked multiple times if they took an oath to uphold the Constitution. Yates Cam #1 1:40-2:03; Troutman Cam #1 00:00- 00:23; Johnson Cam 1:26-43.   Around the same time, Blair repeated, "you're not welcome in my house." Troutman Cam #1 00:20-25.   While the complaint alleges that Deputy Troutman then pushed him "on the back of his right shoulder propelling his body forwards towards a large garage door opening," (ECF 6, PageID 65), the "push" is not visible on any of the videos.   Troutman described that same interaction differently: "I put my hand on Mr. Wood's shoulder or arm to direct him to the Youth Building exit.   I did not push Mr. Wood. I did not use any force.   My hand was in contact with Mr. Wood for no more than a second." (ECF 31, PageID 217).   The cameras do capture Plaintiff's response; he told Troutman not to touch him or put his hands on him. Yates Cam #1 2:00-19; Troutman Cam #1 00:15-30; Johnson Cam 1:43-1:53.

As they are walking out, one Defendant said to Plaintiff, "you've been given an order" and Plaintiff asked, "an order? is that a lawful order?" Yates Cam #1 2:10-18; Troutman Cam #1 00:30-35.   The same Defendant continued, "to vacate the property.   So you're leaving." Troutman Cam #1 00:32-35.   Blair repeated, "I've asked you to leave my grounds."   Plaintiff repeated his position that the fairgrounds are not Blair's and are instead public land. Yates Cam #1 2:15-25; Troutman Cam #1 00:36-48

As Plaintiff and Blair walked out of the Youth Building, Defendants remained close to them. Yates Cam #1 2:18-57.   Plaintiff alleges that once outside, Blair continued to speak about Plaintiff's t-shirt. (ECF 6, PageID 65).   As Plaintiff and Mr. Blair continued to argue, one

Defendant spoke into his radio, "Everybody's back here with Sergeant Eubanks, Mr. Blair, we're escorting … We're walking with him to the front gate." Johnson Cam 2:26-35.

While Plaintiff was walking, he announced, "Look at these thugs with badges behind me. How many is there? 1, 2, 3, 4, 5, 6 motherf**kers.  Six b***h ass f**kin' pigs.  F**king thugs with guns that don't uphold the United States Constitution.  F**k all you.  You dirty rat bastards." Yates Cam #1 2:57-3:14; Troutman Cam #1 1:15-31.   As Plaintiff spoke, he stopped and turned towards the officers.   A Defendant instructed him, "keep walking, sir." Yates Cam #1 3:01-05. Plaintiff then turned to Defendant Steiger, telling her, "And you, you're a f**king thief, I've heard about you." Yates Cam #1 3:13- 17; Troutman Cam #1 1:30-35.   Plaintiff walked to a small tent and picked up a cooler and folding chair. Yates Cam #1 3:24-58.

As Plaintiff stopped to pick up his belongings, Deputy Troutman asks Plaintiff to go "this way, sir," Plaintiff tells Deputy Troutman to "shut-up." (Troutman Body Cam, 1:45-1:48); Plaintiff said, "F**king thugs with badges." Yates Cam #1 3:32-38; Troutman Cam #1 1:50-2:00.   Shortly thereafter, Plaintiff proclaimed, "United States Constitution doesn't apply at the Clark County fairgrounds, people." Yates Cam #1 3:41-46; Troutman Cam #1 2:00-05.

Plaintiff and Defendants then disagreed on where Plaintiff should exit.   Plaintiff asserted, "I'm going out the back gate." Yates Cam #1 3:49-53; Troutman Cam #1 2:07-12.   He also told them that he came in the back gate.   But the officers insisted on walking to the front gate. Defendant Johnson said, "we're not going to walk all the way to the back gate" and Plaintiff replied, "Then that's your f**king fat-ass problems, mother**kers.   I'm leaving." Yates Cam #1 3:55-4:02; Troutman Cam #1 2:08-21.   Plaintiff walked away and Blair walked next to him.

As Plaintiff continues walking to the back gate, he ranted at fairgoers and Blair.   Blair asks Defendants to arrest Plaintiff, but Defendants allow Plaintiff to keep walking to the back gate— the gate Plaintiff requested.   Defendants are about 10 feet behind Plaintiff. (Troutman Body Cam, 2:30 – 3:30).

Defendants discussed disorderly conduct.   One Defendant said, "he's talking the whole way out the door, he's still talking." Yates Cam # 4:40-50; Troutman Cam #1 3:00-05.   Blair reported to Defendants, "He's disturbing my peace." Yates Cam #1 4:05-29; Troutman Cam #1 2:37-40.   Plaintiff turned around as he was walking and said to a Defendant, "Look at this bullshit. You're one big man ain't you, mother**ker." Troutman Cam #1 3:40-47.

> Plaintiff (to Defendant Troutman): I'm pressing charges against you.   Battery.
>
> Blair: I'm your witness.   That's bullshit.
>
> Plaintiff: He touched me.   Do you know what the legal definition of battery is?
>
> Blair: You got a lot of mouth, boy.

(Yates Body Cam, 5:45- 5:46).   Plaintiff is a few feet away from Blair when yelling at him. (Id.)

Sgt. Eubanks then decided to arrest Plaintiff for disorderly conduct. (Eubanks Decl., ¶ 23). Deputies Troutman and Shaw executed the arrest, which was without incident. (Troutman Decl., ¶¶ 23-24; Shaw Decl., ¶¶ 22-23).   The force utilized consisted of placing handcuffs on Plaintiff. (Yates Body Cam, 5:50-7:00; Troutman Body Cam, 4:10- 5:15).

One Defendant stated, "we're charging you with disorderly.   Drop your bag." (Troutman Cam, 4:08-5:06).   Plaintiff alleges his "wrists were restrained behind his back with handcuffs and he was again detained on the order of Dean Blair." (ECF 6, PageID 65-66).   Defendants escorted

Plaintiff to the Sheriff's post on the fairgrounds and searched Plaintiff and his backpack. (Id. at 66). He was charged with disorderly conduct and obstruction of official business. (Id. at 66, 76-79).

Plaintiff, proceeding *pro se*, met with a prosecutor, Mark Ross, about the charges. Ross offered Plaintiff a deal—he would dismiss the obstruction charge and amend the disorderly conduct charge to a minor misdemeanor. (Id. at 66, 82.) Plaintiff rejected the offer. (Id.) On October 12, 2016, both charges were dismissed.

Plaintiff brings thirteen claims against Defendants:

Count I: Defendants "unlawfully deprived the Plaintiff of his freedoms, liberties and rights to be unmolested by Government Agents…. The Defendants' conduct deprived Plaintiff of rights, privileges and immunities secured by the Constitution or laws of the United States." (Id. at 67-68.)

Count II: Defendants conspired with Mr. Blair to violate Plaintiff's First Amendment right to freedom of speech and Fourteenth Amendment right to due process. Further, Defendants unlawfully detained Plaintiff in violation of the Fifth Amendment. (Id. at 68-69.)

Count III: Defendants conspired with Mr. Blair to obstruct and prevent Plaintiff's movement, "perpetrating disorderly conduct to facilitate disorderly conduct and violation of rights." (Id. at 70.)

Count IV: Defendants conspired with Mr. Blair to unlawfully detain Plaintiff in violation of the Fifth Amendment to allow Mr. Blair to view and confiscate Plaintiff's t-shirt in violation of Plaintiff's First Amendment right to free speech and Fourteenth Amendment right to due process. (Id. at 71.)

Count V: Defendants unlawfully restrained Plaintiff with handcuffs behind his back, causing pain, suffering, bruising, swelling, and nerve damage to his wrists in violation of his Fourteenth Amendment right to due process. (Id. at 72.)

Count VI: Defendants unlawfully detained Plaintiff in violation of the Fifth Amendment. (Id. at 72-73.)

Count VII: Defendants intentionally inflicted emotional distress on Plaintiff. (Id. at 73- 74.)

Count VIII: Defendants unlawfully seized Plaintiff inside the Youth Building. ECF 28, PageID 183-84.

Count IX: Defendants caused Plaintiff to fear for his personal safety and life. (Id. at 184.)

Count X: Defendant Troutman "forcefully initiated offensive physical contact by shoving the back of Mr. Wood's right shoulder, forcing his upper body forward …." (Id. at 185.)   Further, Defendants unlawfully used handcuffs. (Id.)

Count XI: Defendants unlawfully restrained Plaintiff. (Id. at 186.)

Count XII: Defendants used unreasonable and/or excessive force against Plaintiff. (Id. at 185-86.)

Count XIII: Defendants' actions constitute malicious prosecution. (Id. at 187.)

Defendants' Motion for Summary Judgment by Defendants Chad Eubanks, Joseph Johnson, Jacob Shaw, Cherish Steiger, Mario Troutman, Jr, Matthew Yates, (ECF 31), would have the Court dismiss all claims.   The Report and Recommendation, (ECF 39), would have the Court deny Defendants' motion with regard to Count IV, for First Amendment retaliation and Count XI for unlawful arrest.   All parties object to the Report and Recommendation. (ECF 40, 41.) Additionally, Plaintiff has filed a Motion for Leave to Manually File Certain Items, (ECF 44), and a Motion for Extension of Time. (ECF 52.)   An Amended Objection, (ECF 55), filed with the assistance of counsel, further urges the Court against adopting the recommendation to award summary judgment to Defendants on Counts I, VII, VIII, X and XI.

## II.   Standard

A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

There is no genuine issue for trial where the record "taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one–sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In doing so, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

## III. Analysis

The Report and Recommendation would have the Court grant summary judgment as to Counts I, II, III, V, VI, VII, VIII, IX, X, XII, XIII, but deny it as to Count IV, Plaintiff's First Amendment retaliation claim, and Count XI, Plaintiff's claim for unlawful arrest.

With regard to Counts I, II, III, V, VI, VII, VIII, IX, X, XII, XIII, the Court has reviewed the findings of the Magistrate Judge and has made a *de novo* review of the record pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). The Court will adopt the Report and Recommendations (ECF 39) insofar as it recommends that summary judgement be entered in favor of Defendants in Counts I, II, III, V, VI, VII, VIII, IX, X, XII, XIII.

**Unlawful Arrest**

Defendants claim they are entitled to summary judgment because as they are entitled to the defense of qualified immunity on Plaintiff's Fourth Amendment Unlawful Arrest claim. The Report and Recommendation would have the Court deny summary judgment. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as their actions reasonably could have been thought consistent with the

10

rights they are alleged to have violated. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).

"Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Id. (citations omitted); see also *Brosseau v. Haugen*, 543 U.S. 194 (2004); *Saucier v. Katz*, 533 U.S. 194 (2001).

In *Saucier*, the Court dictated a two-step inquiry which initially questioned whether there was a potential constitutional violation and only then asked whether the implicated right was 'clearly established.'   However, in *Pearson* the United States Supreme Court held that courts are no longer obliged to conduct the qualified immunity analysis in the sequence set forth in *Saucier*. *Pearson*, 555 U.S. at 239.

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004).   This inquiry turns on the circumstances of the case compared to prior precedent. *Poe v. Haydon*, 853 F.2d 418, 425 (6th Cir. 1988).   Ordinarily, these questions can be answered by the court as a matter of law. See *Dickerson v. McClellan*, 101 F.3d

11

1151, 1157 (6th Cir. 1996). *Schroeder v. City of Vassar*, 371 F. Supp. 2d 882, 896 (E.D. Mich. 2005), *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

Plaintiff's eleventh claim asserts Defendants unlawfully restrained him. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because arrests are "seizures" of "persons" they must be reasonable under the circumstances." See *Payton v. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371 (1980). A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence. *Atwater v. Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536 (2001).

To determine whether an officer had probable cause for an arrest a court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795 (2003). Because probable cause "deals with probabilities and depends on the totality of the circumstances," 540 U.S., at 371, 124 S. Ct. 795, it is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules," *Illinois v. Gates*, 462 U.S. 213, 232, 103 S. Ct. 2317 (1983). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 243-244, n.13, 103 S. Ct. 2317 (1983). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090 (2014).

Courts regularly look to state statutes—and state decisional law further interpreting those statutes—to determine what constitutes an "offense" under state law for purposes of a probable cause analysis. See e.g. *Harris v. United States*, 422 F.3d 322, 328-30 (6th Cir. 2005); *Young v.*

12

*Owens*, 577 F. App'x 410, 414 (6th Cir. 2014). The issue of probable cause (or arguable probable cause) turns on whether a reasonable officer could interpret Ohio's disorderly conduct statute to confer probable cause to arrest Plaintiff. See *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997); *United States v. Nelson*, 500 F. App'x 90, 92 (2nd Cir. 2012) (relying on New York Court of Appeals decision interpreting New York's disorderly conduct statute).

It is—and was at the time of Plaintiff's arrest—well established that "an officer may not base his probable cause determination on speech protected by the First Amendment." *Kinkus*, 453 F.Supp.3d at 1014. And, "[s]ince the day the ink dried on the Bill of Rights, '[t]he right of an American citizen to criticize public officials and policies ... is 'the central meaning of the First Amendment.''" *McCurdy*, 240 F.3d at 520 (quoting *Glasson*, 518 F.2d at 904) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 273, 84 S.Ct. 710 (1964)); see *Barrett*, 130 F.3d at 263 ("Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment.").

However, free speech is not absolute at all times and in all circumstances. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S. Ct. 766, 770 (1942). Fighting words, epithets, and personal abuse are not protected speech. Id. at 572 (calling a city marshal a "damned racketeer" and "damned Fascist" was likely to provoke the average person to retaliation, and thereby constituted fighting words). In a face to face encounter with a police officer, the use of certain language can constitute disorderly conduct.

The Ohio disorderly conduct statute provides:

> (A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
>
> * * * * *

13

> (2) Making unreasonable noise or an offensively coarse utterance,
> gesture, or display or communicating unwarranted and grossly
> abusive language to any person;
>
> (3) Insulting, taunting, or challenging another, under circumstances
> in which that conduct is likely to provoke a violent response;
>
> * * * * *

Ohio Rev. Code Ann. § 2917.11 (West). The statute has been interpreted to prohibit fighting

words and to be consistent with the First Amendment. See *State v. Hoffman*, 57 Ohio St. 2d 129,

387 N.E.2d 239 (Ohio 1979) (upholding constitutionality of disorderly conduct statute).

While academics debate the continued vitality of *Chaplinsky*, police officers assumedly

do so less, and the Supreme Court has been silent on the subject. See, e.g., Burton Caine, *The*

*Trouble with "Fighting Words": Chaplinsky v. New Hampshire Is a Threat to First Amendment*

*Values and Should Be Overruled*, 88 MARQ. L. REV. 441 (2004). Ohio cases hold that the words

and conduct at issue here would be sufficient to constitute probable cause to arrest for disorderly

conduct. *Cincinnati v. Karlan*, 39 Ohio St. 2d 107, 314 N.E.2d 162 (Ohio 1974) determined that

the statements "I hate all of you f**king cops," "get out of my way you f**king, prick-ass cops,"

and "prick-assed cop" made to a police officer were punishable. Id. at 110. *Karlan* was decided

on remand from the United States Supreme Court, see *Karlan v. City of Cincinnati*, 416 U.S.

924, 94 S. Ct. 1922 (1974), which directed the Ohio Supreme Court to reconsider its original

disposition of the case, see *Cincinnati v. Karlan*, 35 Ohio St. 2d 34, 298 N.E.2d 573 (Ohio

1973), in light of *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S. Ct. 970 (1974).

The Ohio Supreme Court held that "…persons may not be punished for speaking

boisterous, rude or insulting words, even with the intent to annoy another, unless the words by

their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace." *Karlan*, 39 Ohio St. 2d at paragraph one of the syllabus (citations omitted). It defined "fighting words" as "epithets, used in a public place and willfully directed at those who can hear them [that] are likely to provoke the average person to an immediate retaliatory breach of the peace…" Id. at paragraph two of the syllabus. While police officers are not average individuals, and more might be expected of them, that is not the standard; the "average person" is.

Where the offended party is a police officer, a distinction lies in whether the "language was non-personal and not directed to the particular officer and language which was intentionally directed to the particular officer." *Ohio v. Wood*, 112 Ohio App. 3d 621, 627-28, 679 N.E.2d 735 (Ohio Ct. App. 1996) (affirming conviction of Robert E. Wood for yelling and gesturing "F**k you" at police officers). The Court held that to tell anyone, including a police officer, "F**k you," either verbally or via an extended digit, may indeed constitute fighting words, depending on the circumstances. Id. at 628.

Since *Karlan*, numerous Ohio courts have upheld disorderly conduct convictions or found probable cause to arrest. See e.g. *State v. Hale*, 2018-Ohio-1431, 110 N.E.3d 890 at ¶¶ 7, 19-20 (Ohio Ct. App. 2018) (disorderly conduct conviction affirmed where defendant told an officer "f**k you" and "suck my dick" (twice)); *City of Lyndhurst v. Smith*, 2015-Ohio-303, 2015 Ohio App. LEXIS 259 at ¶ 53 (Ohio Ct. App. 2015) (calling non-officer a "f**king cocksucker" was sufficient to uphold disorderly conduct conviction ); *State v. Carter*, 2005-Ohio4362, 2005 Ohio App. LEXIS 3957 at ¶¶ 5, 11-2 (inebriated defendant yelling "f**k you, f**k you, f**k you" and "F**k the police" outside a bowling alley in a busy parking lot would likely be offensive to a reasonable person); *City of Kent v. Dawson*, 2001 Ohio App. LEXIS at *5-6 (Ohio Ct. App. 2001)

15

("I'll kick your ass," "You're lucky you're in uniform or I'd kick your ass," "Your lucky you're a cop.  F\*\*k you.  You're an asshole" constituted disorderly conduct); *In re Lutseck*, 2000 Ohio App. LEXIS 6219 at \*3-6 (Ohio Ct. App. 2000) ("All you are is a mother f\*\*king pig and you're against me" directed to police officer sufficient for disorderly conduct conviction); *Ohio v. Farnsworth*, 1992 Ohio App. LEXIS at \*2, 8 (Ohio Ct. App. 1992) (defendant's accusation of theft and misconduct against officer coupled with frequent profanity with children present sufficient to constitute disorderly conduct); *Ohio v. Kleeberger*, 1990 Ohio App. LEXIS 5190 at \*2-3, 8-9 (Ohio Ct. App. 1990) (calling police chief a "mother f\*\*ker" and "f\*\*king thief" along with other profanity was grounds for arrest); *Village of N. Randall v. Watkins*, 1980 Ohio App. LEXIS 10363 at \*4-7 (Ohio Ct. App. 1980) (repeated obscenities to officer, including "mother f\*\*ker" were "fighting words" punishable by disorderly conduct statute).

Here, based on the totality of the circumstances and relevant case law, probable cause existed to arrest Plaintiff for disorderly conduct.  Plaintiff's language consisted of personally abusive epithets sufficient under Ohio law to constitute fighting words.  Plaintiff yelled at, cursed at and taunted Defendants in a public place.

Plaintiff refused to follow instructions.  When Deputy Johnson asks Plaintiff to walk towards the front gate, Plaintiff refused and stated, "That's your fucking fat-ass problem, motherfucker." (Johnson Body Cam, 3:19-3:40; Troutman Body Cam, 2:08-2:20).  Additionally, Plaintiff screamed and cursed at Blair.[3]  Plaintiff's actions constitute fighting words within the ambit of Ohio's disorderly conduct statute.

---

[3] Dean Blair is a quasi-state official, acting as the Executive Director of the Clark County Fairgrounds ("Fairgrounds"). which is a parcel of property and/or venue owned and/or operated by the Clark County Agricultural Society ("CCAS").  According to its own website, CCAS "is a nonprofit quasi-state agency which is governed, but

"Although qualified immunity is an affirmative defense, the ultimate burden is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1992).   The plaintiff must prove that a reasonable police officer in the defendants' position would have clearly understood that he was under an affirmative duty not to perform the use of force. *Wallace v. City of Shelby*, 968 F. Supp. 1204, 1211 (N.D. Ohio 1997). Plaintiff has failed to do so.

The Court thus finds that Defendants are entitled to qualified immunity against Plaintiff's false arrest claim, as they had probable cause to arrest him for disorderly.   Thus, this Court will grant summary judgment to Defendants on Plaintiff's eleventh claim.

### First Amendment Retaliation Claim

Plaintiff's fourth claim alleges Defendants conspired with Blair to unlawfully detain Plaintiff in violation of the Fifth Amendment to allow Blair to view and confiscate Plaintiff's t-shirt in violation of Plaintiff's First Amendment right to free speech and Fourteenth Amendment right to due process. Id. at 71.   To prove a First Amendment retaliation claim, Plaintiff must prove the following elements:

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Wurzelbacher v. Jones–Kelley*, 675 F.3d 580, 583 (6th Cir. 2012).

---

not funded by, the Ohio Department of Agriculture ("ODA").   Neither Blair, nor any of these entities are defendants.   No Defendants are employed by these entities.

Public employees, like the Defendant deputies in this case, can only be liable for their own misconduct. They cannot be liable for someone else's allege misconduct. *Ashcroft v. Iqbal*, 566 U.S. 662, 677, 129 S. Ct. 1937 (2009). There is no evidence that Defendants surrounded Plaintiff because of his shirt. Defendants were working special duty at the fair to maintain security. They were dispatched to the Youth building where Dean Blair and Plaintiff were located. Their call to duty had nothing to do with Plaintiff's shirt. They were dispatched to a location and they responded. (Eubanks Decl., ECF 31-1, ¶¶ 8-12; Troutman Decl., ECF 31-2, ¶¶ 8-12; Shaw Decl., ECF 31-3, ¶¶ 8-12; Johnson Decl., ECF 31-4, ¶¶ 5-9; Yates Decl., ECF 31-5, ¶¶ 5-9; Steiger Decl., ECF 31-6, ¶¶ 5-9). Dean Blair asked Plaintiff to leave, any alleged adverse action was taken by Blair.

As regards the second element, the Defendants' act of escorting Plaintiff out of the fairgrounds was not a seizure (See Report and Rec., ECF 39, PageID 307-10) or adverse action. *Posr v. Killackey*, No. 01 Civ. 2320, 2003 U.S. Dist. LEXIS 12755 (S.D.N.Y. July 25, 2003) (officers escorting plaintiff out of the courthouse were "merely attempting to get [Plaintiff] to leave the courthouse and that their contact with him was solely to effectuate this purpose").

Finally, there is no evidence of retaliatory animus from Defendants based on Plaintiff's t-shirt. Defendants encountered Plaintiff hours earlier in his "F\*\*k the Police" t-shirt and did not take any action. The Defendants did not ask Plaintiff to leave. The videos do not show any animus from Defendants regarding Plaintiff's shirt. The only action Defendants took was to try to keep the peace after Plaintiff and Dean Blair argued and Dean Blair asked Plaintiff to leave.

Under Ohio law, a public official into whose charge the property is put can withdraw or revoke the privilege to enter and be upon the public areas of public property. *City of Cleveland v.*

*Dickerson*, 2016-Ohio-806, 60 N.E.3d 686, at ¶ 22.   Ohio's trespass statute does not create a burden on the state to prove the agent or owner's motivation or basis for revoking an individuals' implied consent to be on a specific property. (Id. at ¶ 26.)   Under Ohio law, Blair had the right to revoke Plaintiff's consent.   Plaintiff's t-shirt does not make him immune from a decision to remove him, absent evidence that his shirt motivated a decision from a public official.   Plaintiff has no evidence that his shirt motivated a decision by a public official, thus the Court will grant summary judgment to Defendants on Plaintiff's fourth claim.

**Amended Objection (ECF 55)**

Amended Objection, (ECF 55), filed with the assistance of counsel, further urges the Court against adopting the recommendation to award summary judgment to Defendants on Counts I, VII, VIII, X and XI.

With the assistance of counsel, Plaintiff would have the Court construe the first claim of the complaint as a catch all claim, asserting state law claims for assault, battery and false arrest/false imprisonment.   As Defendants point out, even when the Court does this, Plaintiff does not prevail.

Any state-law claims Plaintiff could have asserted are barred by the statute of limitations. Pursuant to Ohio Revised Code § 2305.111(B) the statute of limitations for a state law claim of assault or battery is one year. See also *Stafford v. Columbus Bonding Ctr.*, 177 Ohio App. 3d 799, 810, 2008 Ohio 3948, 896 N.E.2d 191 (Ohio Ct. App. 2008).   Similarly, the one-year statute of limitations set forth in Ohio Rev. Code § 2305.11(A) applies to claims of false arrest as well as to claims of false imprisonment. *Mayes v. City of Columbus*, 105 Ohio App. 3d 728, 746, 664 N.E.2d 1340 (Ohio Ct. App. 1995); *Alter v. Paul*, 101 Ohio App. 139, 142, 72 Ohio Law

Abs. 332, 135 N.E.2d 73 (Ohio Ct. App. 1955). Plaintiff's state law claims accrued on July 29, 2016. (Complaint, ECF 6, ¶ 14-15, PageID 63; Report at ECF 6-2). Consequently, Plaintiff had until July 29, 2017 to file any state law claims based on assault, battery, or false arrest/false imprisonment (unlawful seizure). Plaintiff did not file his Complaint until May 25, 2018— nearly two years after the date that these state law claims accrued. Consequently, these claims, even if they were asserted, are barred by the statute of limitations.

As for any claim for intentional infliction of emotional distress, while the statute of limitations is four years, the claim is a very difficult one under which to prevail. In order to succeed on this claim, a plaintiff must prove (1) that the defendant intended to cause them serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of their serious emotional distress. *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150 (Ohio 1984). "To satisfy that standard, the acts concerned must by their nature go beyond all possible bounds of decency so as to be considered utterly intolerable in a civilized community." *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34 (Ohio Ct. App. 1983). Plaintiff has neither alleged nor proven any acts by Defendants that by their nature go beyond all possible bounds of decency so as to be considered utterly intolerable in a civilized community.

Plaintiff presents no cognizable argument for overruling the Magistrate Judge's decision dismissing his civil conspiracy and malicious prosecution claims. Much of Plaintiff's factual averments contained in the "Amended Objections" have no relation to this case or have no basis in fact. Thus, Plaintiff's Amended Objection, (ECF 55), will also be denied.

**Plaintiff's Motion for Leave to Manually File Certain Items (ECF 44)**

Next, the Court will deny Plaintiff's Motion for Leave to Manually File Certain Items. (ECF 44.)   Plaintiff filed this motion *pro se*.   In federal court, "parties may plead and conduct their own cases personally or by counsel ..." 28 U.S.C. § 1654 (West).   This has been "consistently interpreted ... as stating a defendant's rights in the disjunctive*." United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978).   A litigant has the right to represent himself or to be represented by counsel; but not the right to both. *Ag Acceptance Corp. v. Veigel*, No. 2:06-CV-272-J, 2008 WL 11452389, at *1 (N.D. Tex. Feb. 11, 2008).   The Sixth Circuit and courts in the circuit routinely strike or refuse to consider *pro se* pleadings filed by represented parties. *Chasteen v. Jackson*, No. 1:09-cv-413, 2012 WL 1564493, at *3 (S.D. Ohio May 3, 2012) (citing *United States v. Flowers*, 428 Fed. App'x 526, 530 (6th Cir. 2011)); see also *United States v. Degroat*, No. 97-cr-20004-DT-1, 2009 WL 891699, at *1 (E.D. Mich. Mar. 31, 2009) ("The court will strike the *pro se* motion because, now that Defendant is represented by counsel, all filings must be made by the attorney of record.").

**Motion for Extension of Time (ECF 52)**

Finally, Motion for Extension of Time, (ECF 52), requests that Court grant a continuance of the disclosure of trial exhibits, the ability to reopen discovery, an order that Defendants turn over the full and complete electronic version of a letter recently sent from Blair to Woods via the Clark County Sheriff's Office with all original metadata intact, and the ability to amend multiple pleadings, pursuant to Fed. R. Civ. P. 15(a)(2).   Plaintiff seeks information about a recent trespass order issued by Dean Blair and the County Fairground.

Unrelated claims against different defendants belong in different suits. *Hetep v. Warren*, 27 Fed. App'x 308, 309 (6th Cir. 2001) (holding a district court does not abuse its discretion in

denying a motion to amend where the motion to amend "sought to allege new, unrelated claims against new defendants"); see also *Burfitt v. Erving*, No. 1:18-cv-260, 2018 U.S. Dist. LEXIS 204350 at *3 (S.D. Ohio Oct. 30, 2018) (denying leave to amend to add unrelated constitutional claims); *DeJarnette v. Shoop*, No. 2:18- cv-520, 2019 U.S. Dist. LEXIS 9188 at *10 (S.D. Ohio Jan. 18, 2019) (striking amended complaint which sought to add new First Amendment retaliation claim); *Robinson v. Buffaloe & Assocs.*, PLC, No. 3:13-0146, 2013 U.S. Dist. LEXIS 110338 at *8-10 (M.D. Tenn. Aug. 6, 2013); *Whipple v. Tenn. Bd. of Paroles*, No. 1:17-cv-148, 2018 U.S. Dist. LEXIS 44368 at *22- 24 (E.D. Tenn. Mar. 19, 2018) ("A Court may deny leave to file a supplemental pleading where that pleading relates only indirectly, if at all, to the original complaint and the alleged cause of action arose out [of] an entirely unrelated set of facts.").

Here, no common nucleus of operative fact exists between the original claims and potential new claims stemming from the trespass order Plaintiff seeks to investigate and add. The time period in which the alleged acts occurred are almost four years apart. The acts complained of are not related. In the original Complaint, the basis of Plaintiff's claims is an unlawful seizure on July 29, 2016. The witnesses are different. None of the named Defendants in the original complaint are even alleged to have any involvement with the January 2020 letter.

Defendants will not be required to conduct additional discovery and to prepare a defense on Plaintiff's alleged new claims, which are factually unrelated to the claims presented in the original complaint, given that Defendants have already moved for summary judgment on the original claims. *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) ("allowing amendment [of the complaint] after the close of discovery creates significant prejudice [to

22

defendants]") citing *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986). Thus, Plaintiff's Motion for Extension will be denied.

## IV.    Conclusion

Report and Recommendation from Magistrate Judge Sharon L. Ovington, (ECF 39), is **ADOPTED** insofar as it recommends granting Defendants' Motion for Summary Judgment and **REJECTED** insofar as it recommends denying it. Because Defendants are protected from Plaintiff's false arrest claim by qualified immunity, and because Plaintiff does not have evidence to prove a claim of First Amendment Retaliation, Objection to Report and Recommendations by Defendants Chad Eubanks, Joseph Johnson, Jacob Shaw, Cherish Steiger, Mario Troutman, Jr, Matthew Yates, (ECF 40), is **SUSTAINED**. Objection to Report and Recommendations by Plaintiff Michael A. Wood, (ECF 41), and Amended Objection to Report and Recommendations and Response to Defendants Objections to Report and Recommendations by Plaintiff Michael A. Wood, (ECF 55), are **OVERRULED**. Therefore, Motion for Summary Judgment by Defendants Chad Eubanks, Joseph Johnson, Jacob Shaw, Cherish Steiger, Mario Troutman, Jr, Matthew Yates, (ECF 31), is **GRANTED**. Because parties are not entitled to hybrid representation, Plaintiff's Motion for Leave to Manually File Certain Items, (ECF 44), is **DENIED**. Because it seeks to raise unrelated claims against new defendants, Plaintiff's Motion for Extension of Time, (ECF 52), is **DENIED**.

The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, May 11, 2020.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE